FIRST NATIONAL BANK OF GALESBURG

v.

JOHN S. CLARK ET AL.

*Partnerships—Power of General Partners to Bind Silent Partner in Outside Enterprise.*

Where a firm is composed of several general and one silent partner, and the general partners enter upon a new enterprise under a different firm name, to which the silent partner gives his consent, but distinctly declines to assume any liability therein, such general partners, or the new firm, can not bind the old firm or the silent partner for debts contracted in the prosecution of the new enterprise, especially where the creditor has acted with full knowledge of all the facts.

[Opinion filed December 8, 1890.]

APPEAL from the Circuit Court of Knox County; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. WILLIAMS, LAWRENCE & BANCROFT, for appellant.

A limited partnership is a creation of the statute and as to the special partner is in derogation of the law. A person who seeks the benefits of this limited liability must bring himself squarely within the letter of the statute. Failing to do this, he loses the protection of the statute, and his liability is that of a general partner. Henkel v. Heyman, 91 Ill. 96; Parsons on Partnerships, *532.

The authority of one partner to bind the firm in the transaction of the firm business and the liability of each partner for the acts of his fellow partners in the usual conduct of the firm's business grow out of and are inherent in the partnership relation. The law implies this authority and holds partners to this liability because without it a partnership could not exist, nor. its business be carried on. Pahlman v. Taylor, 75 Ill. 629; Parsons on Partnership, *172.

As to third persons the authority of each member of a firm to assume obligations, for the benefit, or in the interest of the firm in the line of the firm's business, is not limited by any special agreement between the partners themselves, except so far as such special limitations are brought to the knowledge of persons dealing with the firm; and no change in the composition of the firm will release the withdrawing member as to persons who have before that time been dealing with the firm, until such persons are notified of such withdrawal. Lindley on Partnership, *170, *174, (246), *186.

The authority of partners to bind the firm being general, even where notice of limitations upon such authority is given, the general authority continues except so far as it is expressly limited by the terms of the notice.

A member of a firm can not, while he continues in the relation, deprive his partners, without their consent, of their authority to bind all the members of the firm in the conduct of its proper business, even by giving notice to the public

that he will not be bound by their action. A majority of the members of the partnership have the right to bind all the members within the scope of the partnership business, if they act in good faith—even though some member of the firm shall expressly notify the persons who afterward seek to hold the entire firm that he is not to be bound by the acts of his partners. Noyes v. New Haven, etc., 30 Conn. 1; Johnston v. Dutton, 27 Ala. 245; Parsons on Partnership, *126 (132), *94 (98), *95, *96, *98; West Stage Co. v. W., 2 Iowa, 504; 65 Am. Dec., 789–792; Mason v. Partridge, 66 N. Y. 633; Butler v. Toy Co., 46 Conn. 136; Vice v. Fleming, 1 Y. & J. 227; Wilkins v. Pearce, 5 Den. 541–44, affirmed on appeal; Pearce v. Wilkins, 2 Comst. 469–72.

Messrs. KIRKPATRICK & ALEXANDER and GRIER & STEWART, for appellee, John S. Clark.

The law is well settled, we apprehend, that a portion of the partners can not change the firm name, without the consent of all, actual or implied, and bind the other members of the firm thereby. Palmer v. Stephens, 1 Denio (N. Y.), 471; Parsons on Partnership, Chap. 6, p. 126; Pentz v. Stanton, 10 Wend. 271; Lindley on Partnership, Book 2, Chap. 1, Sec. 5, p. 184.

Money advanced on the credit of one or more members of a firm, can not be held as a debt of the firm even though the firm receives the benefit of it.

In National Bank of Salem v. Thomas, 47 N. Y. 15, the court say: "The question in all cases is whether the name of the firm used, and to which credit is given, is that of the firm, or a name which the firm has adopted and used as a name to designate the partnership; and it is only in cases where such name has been used that the members of the firm have been held."

Sustaining our proposition are the following: Emily et al. v. Lye et al., 15 East, 7; Leroy et al. v. Johnson, 2 Peters, 186; National Bank v. Bank of Commerce, 44 Ill. 271; Watt v. Kirby, 15 Ill. 200; Wittram v. Van Wormer, 44 Ill. 525, the two first of the above cases sustaining in full the New York case cited.

The entries in the books of the bank, and the taking of the notes in a name other than the name of the firm sought to be held, is evidence that the dealings were not with the firm sought to be held.    Storr et al. v. Scott, 6 Carrington & Payne, 241; Thompson v. Davenport et al., 9 Barn. & Cresswell, 78; 1 Greenleaf on Evidence, Sec. 196; Hardman v. Bradley, 85 Ill. 162; Baird v. Hooker, 8 Ill. App. 306.

C. B. Smith, J.    This was an action in assumpsit brought by appellant against the Monmouth Printing Company, the Evening Gazette, G. G. McCosh, C. J. Wood, S. S. Clark and John S. Clark.    The suit was brought on four promissory notes.    The aggregate of the principal sum due on those notes was $5,000.    The first three notes were all executed at the same time but in fact bear different dates.    They were given to meet and secure overdrafts in the bank which had accrued at the several dates of the three notes.    The first three notes when they were executed and delivered to the bank were signed as follows:

" The Evening Gazette, per G. G. McCosh, C. J. Wood," and all exactly alike as to the signatures.    Shortly after the notes were so given and received, the bank, through some of its officers, required McCosh and Wood to add to these notes the name of the " Monmouth Printing Company," which was done by them, Wood and McCosh being two of the proprietors of the "Monmouth Printing Company."

After these three notes were all executed and so signed, in August, 1888, another note was made to meet another overdraft in the bank and that note was signed as follows:

" Monmouth Printing Company, per G. G. McCosh, C. J. Wood."    None of these notes were paid and the bank brought suit upon them.    All the defendants except John S. Clark were defaulted, against whom, on the hearing, the court assessed the damage and gave the bank judgment for the amount due.    John S. Clark appeared and pleaded the general issue, and that he was not jointly liable. . He also pleaded that the Monmouth Printing Company never did business under

the name of the Evening Gazette, and that at the time the
notes were made the Monmouth Printing Company was not
a party thereto; that its name was not added to the notes
until long after their execution and delivery, and then with-
out any consideration. On these pleas issue was joined and
a trial before the court without a jury resulted in a finding
and judgment in favor of John S. Clark. The bank brings
the case here on appeal and insists the court erred in its find-
ing and judgment, and in its holdings upon a large number
of propositions of law which were submitted on both sides.

A brief reference to the facts out of which this suit grows,
is necessary to a correct understanding of the questions
involved. The Monmouth Printing Company was organized
in 1886. The company was composed of G. G. McCosh and
Samuel S. Clark as general partners, and John S. Clark as a
special partner. In 1887 C. J. Wood was admitted into the
company as a third general partner under the terms of the
original contract. The object of this company was to pub-
lish two newspapers, viz., the Monmouth Atlas, a weekly
paper, and the Evening Gazette, a daily paper, both to be
published at Monmouth, and for the further purpose of
doing general printing business in that city. In 1888 it
seemed desirable, at least to the three general partners, to
divide the establishment and to remove the Evening Gazette
to the city of Galesburg and publish it there. With this
object in view the three general partners, S. S. Clark, G. G.
McCosh and C. J. Wood, went to Galesburg and consulted
with the citizens there about the scheme they had in view of
removing the Evening Gazette to that city, and publishing it
as an independent daily paper, provided they could secure
sufficient financial aid and encouragement to justify them in
removing the paper to that city. This visit to Galesburg and
consultation with certain citizens there resulted in the execu-
tion of a paper and proposition, signed by fifty citizens of
Galesburg, to C. J. Wood, G. G. McCosh, J. S. and S. S. Clark.
The substance of this proposition was that if these parties
would remove the Evening Gazette to Galesburg and publish
it there as an independent paper and remove there also the

presses and material connected with such paper and discontinue its publication at Monmouth, then these fifty persons obligated themselves that the said paper should receive a subscription list at $5 per annum, that should aggregate at least $1,000, to be paid in advance within ten days after the first issue of the paper in Galesburg, and they further guaranteed advertising to the amount of $1,000, from the non-advertising parties of the city and they further guaranteed that in case these parties should still require more money to publish the paper that they would procure them a loan, not to exceed $5000, to be paid, however, by the proprietors of the paper.

When this paper had been signed by fifty responsible citizens of Galesburg and the subscription list procured and the amount of advertising properly pledged and delivered, it was then in turn accepted by three of the parties named in the proposition, viz., S. S. Clark, G. G. McCosh and C. J. Wood. John S. Clark did not sign it. But at the bottom of this written acceptance, signed by the three general partners, John S. Clark wrote the following memorandum, viz.:

" I, John S. Clark, a silent partner in the Monmouth Printing Company, by which the Evening Gazette is printed at Monmouth, consent to the making of the above agreement by my partners, without myself assuming any of the obligations therein contained.

JNO. S. CLARK."

After these agreements had been signed the Evening Gazette was removed to Galesburg, and the agreements were carried out by all parties and the publication of the paper promptly commenced.

Appellant was selected as the bank in which the Gazette should keep its accounts and do its business. An account was opened in the name of the Evening Gazette and the contracts above referred to were placed in the hands of the bank as collateral security for any indebtedness or overdraft the Gazette might make. The subscriptions were paid to the bank and not to the Gazette or its owners, and the Gazette was credited with the amounts as they were paid in. At the very

beginning of this transaction the bank had full and actual notice from these contracts, upon which the rights and liabilities of all the parties depended, that John S. Clark disclaimed any connection with the whole scheme except to consent that his partners might go into it, and expressly declared that he would assume no obligations therein contained. It seems to us very clear that all parties to this scheme understood that the transfer of the Gazette from Monmouth to Galesburg was an independent enterprise entered upon by three of the partners of the Monmouth Printing Company, and that these three men there entered upon a new business scheme and new and independent relations with the citizens of Galesburg, with which John S. Clark, at least, had nothing to do.

It seems to us too plain for serious consideration or argument to say, that because these three general partners saw fit to go to another county and there by themselves alone enter into a business enterprise on their own account with strangers and in their individual names, that they could thereby bind another partner who did not go into such enterprise, and charge him with the debts and liabilities of such new enterprise, even though there had been no express denial and disclaimer of liability by the partners who did not engage in the new enterprise.

There can be no pretense here that the bank or its officers, with these agreements and Clark's disclaimer of liability before their eyes, parted with their money on the strength of Clark's credit. Exactly the reverse is true. When the three first notes were taken, no one supposed that either John S. Clark or the Monmouth Printing Company had anything to do with the debts of the Evening Gazette, and its name was not then put on these notes, and was not put on them until some time after their execution and delivery, and after it was ascertained the Evening Gazette and its owners were not good. Then, for the first time, it was determined to add the name of the Monmouth Printing Company, for the purpose of holding John S. Clark to the first three notes, and when the fourth note was executed the name of the Gazette was not put on it but the Monmouth Printing Company was. We

First Nat. Bk. of Galesburg v. Clark.

think the addition of this Monmouth Company to the three notes, and the execution of the fourth one in its name, was an afterthought and an attempt to make John S. Clark liable for money not advanced to him, nor on account of his credit, nor to his firm. Whether he was a general or special or secret or limited partner in the Monmouth Printing Company is wholly immaterial under the evidence in this case. For here his exact position and relation to his copartners was known to appellant before they parted with a dollar of their money. Their position was not that of a creditor dealing with a firm having secret and unknown partners, who would be liable when discovered. Much stress is placed on the fact that the proof shows that some of this money loaned to the Evening Gazette Company was taken by its owners to aid in running the Monmouth concern, in which they still held their interest. But we are unable to see how that aids appellant. They advanced the money to the Gazette and its owners, and even if it be true that these men used some part of this money to assist the Monmouth paper, that would not make Clark liable on these notes for the whole amount, nor even for the amount so used in the Monmouth enterprise by his partners, in this form of action, even if in any other. Loaning money to A to be used in his own business, on his own credit, would not make B liable to the lender, if A gave any or all of it to B, without proof of fraudulent collusion on the part of B to get the money from the lender for his own use.

We think the judgment of the court was right, under the evidence.

We have not examined the ruling and holding of the court on the various propositions of law submitted, for if the judgment is right, it could not affect appellant even if the court had not correctly held all or any of his positions of law.

The judgment is affirmed.

*Judgment affirmed.*